PAUL W. TILLINGER and VERONICA TILLINGER, Plain-
tiff and Appellants, v. STANTON ELBERT FRISBIE, De-
fendant and Respondent.

No. 9597.

Submitted September 17, 1957. Decided November 8, 1957.
Rehearing Denied December 23, 1957.
318 Pac. (2d) 1079.

Mr. Frank E. Blair, Virginia City, Mr. Ralph J. Anderson
and Mr. Stanley P. Sorenson, Helena, for appellants.

Mr. Lyman H. Bennett, Virginia City, and Mr. Lyman H.
Bennett, Jr., Bozeman, for respondent.

Mr. Anderson and Mr. Bennett, Jr., argued orally.

MR. JUSTICE CASTLES:

This appeal involves a dispute over the boundary line between
the lands of the appellants, hereinafter referred to as plain-
tiffs, in Section 4 and the lands of the respondent, hereafter re-
ferred to as the defendant, in Section 3, Township 5 south,
Range 1 west, M.P.M., Madison County, Montana. The plain-
tiffs are the owners and have been in possession since 1936 of
the south half of the northeast quarter and the southeast quar-
ter of Section 4, Township 5 south, Range 1 west, M.P.M. The
defendant is the owner and in possession of the southwest quar-
ter of Section 3, which property was deeded to the defendant

in 1943 by a predecessor in interest, one Wilson, who had been the owner of the property since 1927. All conveyances of both properties describe the land by governmental subdivisions.

Prior to the year 1938 there was no fence or visible division line between the described subdivisions. At that time, Wilson, the then owner of the lands now owned by the defendant, and the plaintiff Tillinger erected a fence between their respective properties; Wilson constructing one-fourth mile of the fence and Tillinger constructing the other one-fourth mile of fence. The two fences were in a straight line, but were not joined, each being tied to its own end post. These posts were about two feet apart.

The fence was located by Wilson, who, with his son, attempted to run a line by eye, extending some existing fence lines, assuming them to be accurate and true. It is quite clear from the record that Wilson intended to build the fence on the true line. It is equally apparent that the location of the fence line was not intended to settle any dispute. There was no dispute at the time. Both parties knew the section line was the boundary. They did not know where the corners were.

The dispute involves a piece of land, eighty feet in width at one end, and fifteen feet in width at the other, extending for one-half mile between the fence and what the plaintiffs attempted to establish as the actual line by the governmental survey. The area involves about three acres.

To establish the actual line, the plaintiffs had a survey made by an experienced licensed surveyor who testified at the trial, producing his field notes and being subjected to a searching cross-examination.

The trial court in connection with this fence, found as follows:

"That although there is no direct evidence of an express agreement that the fence as originally constructed and since located should constitute the boundary line between the two tracts of land herein involved, the Court finds that there was an agreement, ensuing from uncertainty as to the true location of the boundary line, between the plaintiffs and defendant and

defendant's predecessor in interest, that such fence constituted the true boundary line between said tracts, implicit in and to be implied from the circumstances of the case and the conduct of plaintiffs and defendant and defendant's predecessor in interest from the time of the construction of the fence up and until at least April 1950, a period in excess of the statute of limitations, and during which period the plaintiffs and defendant and his predecessor in interest acquiesced in and accepted, as appears from their conduct and the evidence, the said fence and its location as the true boundary line between the lands of plaintiffs and the lands of the defendant.

"That the foregoing findings are made notwithstanding any contention of the plaintiffs or evidence that the construction or location of the fence was dictated by convenience, or that it was erected merely as a stock barrier, and the Court specifically finds that the construction or location of the fence was not dictated by convenience, that the fence was not erected merely as a stock barrier, that neither the plaintiffs nor the defendant nor defendant's predecessor in interest knew at any time, at least prior to the survey of Mr. Bosworth in 1952, the location of the true boundary line, and that there is no evidence that the fence was located pursuant to an agreement to move it to conform to the true line upon the making of a survey."

The plaintiffs' specifications of error on this appeal raise two questions: (1) Has the fence between the properties of the plaintiffs and the defendant become by agreement or acquiescense the established line between the properties of the parties hereto binding upon them? (2) Is the line established by survey a true line between the properties of the plaintiffs and the defendant?

We answer the first question in the negative. Since this case was heard by the district judge in the court below, this court has rendered its decision in Reel v. Walter, 131 Mont. 382, 309 Pac. (2d) 1027, 1031. In that opinion this court said, "Again, quoting from Myrick v. Peet, supra, 56 Mont. [13], at page 25, 180 Pac. [574] at page 578: 'The burden of proof is always

upon the party attempting to show the existence of an agreement fixing the location of a boundary line, and that the boundary so fixed had been accepted and acquiesced in. 4 R.C.L., Title, Bouudaries, section 66; Jones v. Pashby, 67 Mich. 459, 35 N.W. 152, 11 Am. St. Rep. 589'.''

In that same opinion this court also quoted approvingly from Myrick v. Peet, supra, as follows: '' 'It is also well settled that where two adjoining proprietors are divided by a fence which they suppose to be the true line, they are not bound by the supposed line, but must conform to the true line when ascertained. [Citing cases.]' '' See Schmuck v. Beck, 72 Mont. 606, 616, 234 Pac. 477.

Referring now to the trial court's findings previously set forth, there was no direct evidence of any agreement to fix the boundary. Our review of the evidence indicates that there was no evidence, either direct or indirect, of any agreement to fix the boundary. The plaintiff Tillinger testified that the fence was constructed as a stock barrier only.

The defendant's witness Wilson, upon whom the defendant must rely for any agreement testified as follows concerning the inception of the fence.:

''Q. Previous to that time did you have any conversations with Mr. Paul Tillinger about the matter of fencing? A. Yes.

''Q. What if any conversation did you have with him on that subject? A. Well, there had never been a fence separating these two parcels of land and at the time Mr. Tillinger had taken over, the 40 acres that belonged to me was included in the Bob Wilson or Tillinger land, 40 acres that belonged to the Bob Wilson ranch or the Tillinger property was fenced including with my land that I farmed which took a mile of fence. Previous to the time that Mr. Tillinger came on there and Bob Wilson had left the ranch, Earl Sprout operated this Southeast quarter of 4 and the fence posts was rotting off and one thing and another, and Mr. Tillinger taking over, he wanted to know if I wanted to leave it that way; I said no, the fence is down and I am not going to take time to keep up that fence and the half a

mile along the creek line will divide our properties so I am going to put the fence on the line.

"Q. Did you have any talk with him about where the fence was going to be located? A. Later on after some other discussions in regard to ditches come up I was asking him one day if he knew anything about how that would be, a section line comes from the township of Ennis, now that would be Township 6 South, Range 1 West, and comes across that township, if he knew how that was, fence was, if they were on the line or not, how the line was. He said that he knew from surveys that had been made in Ennis over lots and stuff that the fence was practically up with the township line at Ennis because they had surveyed that, different parties in Ennis, over lots to establish their lot boundaries and that that line was coming north down between what was the Bill Thexton Hot Springs land and other lands east of that was close onto the line, so that was what he said in regard to that."

Then, the same witness, Wilson testified further:

"Q. Now you built that primarily for a livestock barrier, I suppose, to keep your livestock in and other people's livestock out? A. Yes, sir, I built a good fence.

"Q. Would it keep livestock in and out? A. For the purpose of keeping out stock.

"Q. In other words, it was probably a legal fence as we understand those things. A. I tried to build a good fence, it was a waste of time not to.

"Q. And the primary purpose of it was to keep stock in and other livestock out? A. Yes, sir."

In Myrick v. Peet, supra, this court quoted from Perkins v. Gay, 3 Serg. & R. 327, 8 Am. Dec. 653, as follows:

" 'If the parties, from misapprehension, adjust their fences, and exercise acts of ownership, in conformity with a line which turns out not to be the true boundary, or permission be ignorantly given to place a fence on the land of the party, this will not amount to an agreement, or be binding as the assent of the parties'."

As we view the record in this case the situation is covered by the case of Myrick v. Peet, supra.

The conversations testified to by Wilson could hardly have amounted to any agreement, express or implied.

In Huddart v. McGirk, 186 Cal. 386, 388, 199 Pac. 494, 495, the California court said: "The conversations hardly amounted to more than statements that each party understood the ditch line to be the true line. This is a very different thing from fixing a disputed or doubtful boundary, and if in fact the understanding of the parties as to the location of the true line was in error, they are not bound by their mistaken understanding. Clapp v. Churchill, 164 Cal. 741, 130 Pac. 1061.''

Wilson had assumed that existing fences were in their correct location and attempted to extend his fence in a straight line. Both parties in the instant case were mistaken as to where the true boundary was when the fence was built, but they did not negotiate a boundary settlement nor did they acquiesce. Wilson attempted to place the fence on the true line. There was no dispute between the parties as to what the true line was; they simply could not find the original government survey and apparently could not hire a surveyor to locate it for them. The entire record is clear that they intended to place the fence on the true line.

Prior to 1950, a dike extended across what was believed to be the defendant's land, inside the fence. At that time, the defendant began to enlarge the dike and the ditch which crossed it. The plaintiff objected immediately and warned the defendant that he should not rebuild the dike until the true line was found. The defendant chose to ignore this warning and proceeded to make extensive improvements. Thereafter, the plaintiffs caused a survey to be made as previously indicated.

Many of the authorities in other states attempt to categorize the fact situations which raise boundary line disputes. In this jurisdiction, ample rules have been laid down through our decisions. Hoar v. Hennessy, 29 Mont. 253, 74 Pac. 452; Borgeson v. Tubb, 54 Mont. 557, 172 Pac. 326; Box Elder Livestock

Co. v. Glynn, 58 Mont. 561, 193 Pac. 1117, have all gone to establish the general rule that an oral agreement between coterminous owners establishing a boundary line is not within the statute of frauds as conveying the fee, where at the time of entering into it they were in doubt or ignorance of the true line and a real controversy as to it existed between them.

The other cases, Myrick v. Peet, supra; Schmuck v. Beck, supra; and the recent case of Reel v. Walter, supra, have been cases in which there was no agreement to fix a boundary and no dispute or controversy as to the true line. There was, at most, an ignorance or mistake as to the location of the true line, and the fact situation revealed an intention to have the fence on the true line. These cases are in point here.

The second question posed is whether the line established by the plaintiffs' surveyor is the true line. We find that it is.

This being an equity action, the court will review all questions of fact arising upon the evidence presented in the record. R.C.M. 1947, section 93-216.

Plaintiffs caused a survey to be made by one Bosworth, an experienced and licensed surveyor. He had previously made a survey in the area in 1929, and had used as a starting point the section corner common to Sections 3, 4, 9 and 10, which point is in the south end of the area in question. At that time, he testified, the corner was in place. In 1952 when he made the survey for plaintiffs, the corner was not in place, but using his original notes which were admitted in evidence, he was able to reestablish the location of the corner.

Then, as to the section corner common to Sections 3, 4, 33 and 34, which corner Bosworth used as the north end of the section line, Bosworth reestablished its location. He did this by making inquiry of a former resident on the property, who had known of its location. In addition he ran a line from the previously mentioned corner common to Sections 3, 4, 9 and 10 north on the bearing shown by the original government field notes as the bearing of the line. That bearing was North 0° 15' West. The line he established was North 0° 14' 40" West or

within 20 seconds of the exact bearing. For every practical purpose this is accurate. The surveyor Bosworth did not rest there, but checked against other corners on the section line of adjoining sections. In each case, the corner checked as being accurately reestablished.

The surveyor's testimony stands undisputed except that another experienced licensed surveyor, named Matthew, testified from memory, some four years after he had surveyed in the area. He did not have field notes, first testifying that they had been destroyed and subsequently that they had been lost. He testified on direct examination that he measured from the east to west from a tie on the boundary of the Montana Power Company reservoir survey, and that he believed the measurements were short of reaching the corner. Also, that measurements from the State Highway Survey Station from the west were short. It is interesting to note that the survey of Bosworth checked in to the same two old surveys, that is, the Montana Power Company survey and the State Highway Survey and were not short. Bosworth was testifying from field notes which were admitted in evidence. Matthew was testifying from memory of four years. Matthew concluded that the fence was the accepted line. However, on cross-examination, the same surveyor admitted that by one of his measurements the true corner was 76 feet east of the fence. The 76 feet compares very closely with the 80-foot measurement of surveyor Bosworth.

We conclude after careful examination of the testimony and the exhibits that the trial court was in error in holding that the survey of Bosworth was inaccurate.

For the foregoing reasons, the judgment is reversed. The District Court is directed to enter a decree quieting title in the plaintiff in the south half of the northeast quarter and the southeast quarter of section 4, all in Township 5 south, Range 1 west of the Montana Principal Meridian and; that the section corner common to Sections 3, 4, 9 and 10, Township 5 south, Range 1 west, Montana Principal Meridian, as reestablished by Homer C. Bosworth, a duly licensed land surveyor, is the true

section corner and is the exact position it was originally placed in by the government surveyors in the original survey; that a line running north 0° 15′ West from said reestablished section corner to a point corresponding to the quarter, corner common to said Sections 3 and 4 is the true boundary line between the land owned by the plaintiffs and the defendant.

MR. CHIEF JUSTICE HARRISON, and MR. JUSTICES BOTTOMLY, ANGSTMAN, and ADAIR, concur.